Lawrenceville Stakeholders, :
Mary Coleman, Jill Joyce, :
Bill Joyce and Victor Capone :
  :
  v. :
  :
The City of Pittsburgh Zoning :
Board of Adjustment :
  :
  v. :
  :
City of Pittsburgh :
  : No. 779 C.D. 2020
Appeal of: Duncan Ventures, LLC : Argued: February 9, 2021


BEFORE:    HONORABLE RENÉE COHN JUBELIRER, Judge
              HONORABLE PATRICIA A. McCULLOUGH, Judge (P.)
              HONORABLE CHRISTINE FIZZANO CANNON, Judge


OPINION
BY JUDGE FIZZANO CANNON          FILED: March 5, 2021


         Appellant, Duncan Ventures, LLC (Duncan) appeals from the July 13, 2020, Order of the Court of Common Pleas of Allegheny County (trial court) reversing the October 30, 2019, decision of the Pittsburgh Zoning Board of Adjustment (Board). Over the opposition of Appellees (Lawrenceville Stakeholders and Neighbors),[1] the Board granted Duncan four dimensional variances from the Pittsburgh Zoning Code (Code) for a Lawrenceville property (the Property) currently zoned for single attached dwellings. Duncan planned to develop the Property by

---

[1] Neighbors, Mary Coleman, Jill Joyce, Bill Joyce, Victor Capone, and the organization called Lawrenceville Stakeholders are the Appellees before this Court.

demolishing an existing detached single residence on the Property, subdividing the parcel, and building five new four-story attached single-family dwellings with garages, rear decks, and rooftop decks. Upon review, we affirm the trial court's order.

## I. Factual & Procedural Background

In June 2019, Duncan applied to the City of Pittsburgh's Division of Zoning and Development Review for dimensional variances necessary to develop the Property. Reproduced Record (R.R.) at 29a-31a. The Property, an irregularly shaped 7500-square-foot parcel of land with a two-story detached single-family residence built in the 19th century, is in the R1A-VH (Residential Single-Unit Attached, Very High-Density)[2] zoning district in the Central Lawrenceville neighborhood.[3] *Id*. at 29a-31a. The Property, located at 186 Home Street, is located

---

[2] Pursuant to Section 903.03.E.2 of the Pittsburgh Zoning Code (Code), the R1A-VH designation is for high-density residential areas with single-family residences. The minimum lot size is 1200 square feet and the maximum height of a structure is 40 feet not to exceed 3 stories. The minimum rear setback (required open space) is 15 feet. Minimum front, exterior side, and interior side setbacks are 5 feet with the potential for a reduced minimum "contextual" side setback pursuant to Section 925.06C of between 3 and 5 feet depending on the lot width, with 3 feet being available for lots narrower than 37 feet across.

[3] During the pendency of this appeal, Neighbors advised this Court that in October 2020, the detached single residence was ultimately demolished by the current owners, who obtained a permit for the demolition. Neighbors' Br. at 3 n.2 & 6 n.4 (citing City of Pittsburgh's Permits, Licenses, & Inspections website (https://pittsburghpa.buildingeye.com/building) (last visited Feb. 9, 2021) and specifying Permit Number DP-2019-09535 (Residential General – Complete Demolition)). Neighbors asked this Court to take judicial notice of the demolition permit, citing cases where this Court has previously taken judicial notice of information available on local governmental public records websites. *Id*. at 3 n.2 (citing *Collier Stone Co. v. Twp. of Collier Bd. of Comm'rs*, 735 A.2d 768 (Pa. Cmwlth. 1999), and *Valley Forge Chapter of Trout Unlimited v. Twp. of Tredyffrin* (Pa. Cmwlth., No. 161 M.D. 2016, filed Dec. 20, 2016), 2016 WL 7369088 (unreported)). Duncan has not objected and has not disputed that the demolition occurred. However, this Court declines to take judicial notice of the demolition permit. Due to our disposition of this matter, whether the house has already been or will later be demolished is not relevant to our analysis.

one block north of Butler Street and bordered by Home Street, Antwerp Way, Eden Way, and by the neighboring lot on 184 Home Street. The shape of the parcel is an irregular quadrilateral. Appellant's Br. at 3.

Duncan agreed to purchase the Property conditioned upon zoning approval and was therefore its equitable owner for purposes of seeking the variances. *Id*. at 146a. Duncan's proposal required four dimensional variances from the Code. First, Duncan requested a variance from Section 903.03.E.2, which generally imposes minimum five-foot interior side setbacks for primary and exterior structures. *See* Board Decision, R.R. at 11a. Duncan requested a variance completely eliminating the setbacks. *Id*. at 8a. Second, and relatedly, Duncan applied for a variance from Section 925.06.C, which reduces Section 903.03.E.2's general 5-foot side setback minimum to a specific "contextual" 3-foot minimum if the lot in question is narrower than 37 feet wide.[4] *Id*. at 11a. Duncan again requested a variance completely eliminating the setbacks. *Id*. at 8a. Third, Duncan applied for a variance from Section 926.129, which requires new lots to front on streets at least 25 feet wide. *See* Trial Ct. Op., R.R. at 300a. Four of the five lots Duncan proposed as its subdivision of the Property would front on Antwerp Way and Eden Way, both of which are only 20 feet wide. Board Decision, R.R. at 9a. Fourth, Duncan requested a variance from Section 903.03.E.2's provision limiting the maximum

---

[4] Section 925.06.C ("Contextual Side Setbacks") states:

"Regardless of the minimum side setback requirements imposed by the zoning standards of this Code, applicants shall be allowed to use a Contextual Side Setback. The Contextual Side Setback shall apply only to primary uses and structures. A Contextual Side Setback may fall at any point between the required side setback and the side setback that exists on a lot that is adjacent and oriented to the same street as the subject lot, but shall be a minimum of three (3) feet." Code § 925.06.C. According to the included table, for lots 37 feet wide or less, the minimum required setback is 3 feet.

3

height of new construction to 40 feet and 3 stories. *Id*. at 11a. Duncan asserted that its proposed townhouses would be within 40 feet tall, but requested a variance to build the structures 4 stories each to account for garages on the ground floor. *Id*. at 9a-10a.

Duncan's application was opposed by Neighbors and various local individuals and entities. A joint letter was submitted to the Board by Lawrenceville Corporation and Lawrenceville United, which work together to "improve and protect the quality of life for all Lawrenceville residents" and to encourage "responsible growth and reinvestment in the Lawrenceville community." *Id*. at 46a. The letter stated that those organizations held an open public community meeting on Duncan's proposal at which "impacted residents" voiced concerns relating to the siting and impact of the proposed townhouses and garages. *Id*. The letter maintained that Duncan's project "does not present any hardship for why the zoning relief is necessary, and consequently we are opposed." *Id*. Another organization, Lawrenceville Stakeholders, which described itself and its members as "advocates for the preservation of historic Lawrenceville," issued a statement opposing the project for the same reasons. *Id*. at 47a. The statement cited density and congestion concerns with Duncan's proposal and alleged it would have an adverse impact on the neighborhood, expressed a belief in the feasibility of developing the Property without variances, and averred that Duncan failed to show an evidentiary basis for the requested variances. *Id*. at 47a.

At the August 2019 hearing before the Board, Matt Stookey (Stookey), Duncan's principal, testified as a fact witness. R.R. at 145a. He stated that he had over 10 years of real estate experience, beginning with "flipping houses" in Detroit, Michigan and later in Pittsburgh. *Id*. at 164a. He stated that he has done "about a

4

dozen" renovations in the Lawrenceville area since 2012 and produced new construction since 2015-16. *Id*. at 164a-65a. He acknowledged, however, that he has neither an appraiser's certification nor a real estate license. *Id*. at 165a.

Stookey acknowledged that the agreement to purchase the Property was contingent upon zoning approval. R.R. at 146a-48a. He submitted into evidence a two-page financial analysis of the project, drafted by him, which cited a purchase price of $415,000 for the Property with the then-existing detached single residence still intact on it and proposed sale prices of $663,000 per new townhouse. *Id*. at 139a-40a. Stookey stated that Duncan had considered a project of only four townhouses, but that building fewer than five townhouses would have resulted in a significant net loss for the overall project. *Id*. at 161a-62a. Except for the analysis drafted by Stookey, Duncan did not produce the actual agreement of sale or any estimates, reports, or appraisals of the fair market value of the Property with the then-existing detached single residence, as a vacant lot, or with any number of townhouses upon it.

Stookey averred that the proposed five attached townhouses, designed to face Eden Way with both front doors and garages opening onto Eden Way, would all be on lots of at least the minimum acceptable size set by the Code and would not exceed the Code's 40-foot height limitations. R.R. at 52a, 147a, 153a & 156a; *see also* Board Decision, 10/30/19, R.R. at 10a (describing the proposed project). Stookey stated that in order to minimize street parking on Home Street, the proposed townhouses were sited with integrated off-street parking garages, which necessitated the townhouses (except for one) being fronted on Eden Way. *Id*. at 52a & 155a. According to Stookey, the parking garages on the ground floor of the proposed townhouses made a fourth story necessary for each residence. *Id*. at 156a-57a.

5

Stookey explained that the orientation of the Property along Eden Way, which is angled between the parallels of Home Street and Antwerp Way, rendered the parcel irregularly shaped. *Id*. at 52a & 153a-55a. This made it necessary for the townhouses to be staggered in such a way that for several feet at the front and back of each townhouse, the structures were unattached from each other. *Id*. In those specific aspects of the proposal, according to Stookey, instead of the Code's provisions for minimum setbacks of five or three feet as required by Sections 903.03.E.2 and 925.06.C of the Code, the requested variances from those provisions would enable all five proposed townhouses to fit on the site. *Id*.

In opposition, Neighbors testified at the hearing. Jill Joyce, a registered architect and resident of Lawrenceville, lives near the Property. R.R. at 169a-70a. She asserted that the proposed five-townhouse project would break up the aesthetic continuity of Home Street. *Id*. at 174a. She recommended a project limited to three townhouses that would not need variances and would lessen the impact on the neighboring area, and she presented a rendering of her proposed alternative. *Id*. at 49a & 171a-72a. She acknowledged that she had not conducted a financial feasibility analysis of her proposal, but believed that Duncan's cited purchase price of $415,000 for the Property, which was part of Duncan's calculations of its expected losses if it could not do the project as proposed with the requested variances, was "really high." *Id*. at 177a.

Mary Coleman, a nearby resident and member of Lawrenceville Stakeholders, also testified for Neighbors. She asserted that Eden Way, on which the proposed five townhouses would front, is a narrow commercial alley parallel to and behind Butler Street, which is the main commercial road in Lawrenceville. R.R. at 186a-87a. It is lined with dumpsters and has daily truck traffic of deliveries and

6

trash pickup for Butler Street's businesses and apartment buildings. *Id*. at 187a. Counsel for Neighbors explained the Code's requirement that houses must front onto a street and that Eden Way is not a street but a commercial alley, such that having five residences fronting on it as Duncan proposes would be a safety hazard. *Id*. at 188a-91a. Ms. Coleman explained that there are already concerns with traffic and congestion in the immediate area that would be worsened by Duncan's project. *Id.* at 192a-93a & 196a.

A further witness for Neighbors was Polly Biswas, who lives at 154 Home Street, about a block away from the Property. R.R. at 199a. She was opposed to Duncan's proposal and averred that to "cram five houses into that one lot, it's going to not only aesthetically detract from Home Street, it's going to make things more congested and worse for the people that currently live there." *Id*. at 200a.

Dave Breingan, executive director of Lawrenceville United, spoke on behalf of that organization and Lawrenceville Corporation. Based on community meetings at which concerns were raised similar to those presented at the hearing, the organizations opposed Duncan's proposal and believed Duncan did not establish "any real hardship that justified supporting the zoning relief that's requested here." R.R. at 202a.

On October 30, 2019, the Board issued its decision granting all of the variances sought by Duncan.[5] R.R. at 8a-12a. The Board accepted Stookey's testimony, citing his "credible financial analysis." *Id*. at 10a, 12a. The Board accurately described the testimony of Neighbors' witnesses in opposition to the variances, but did not specifically opine as to their credibility. *Id*. at 10a-11a. The Board concluded that the irregular shape of the Property and its location

---

[5] A previous version dated October 24, 2019, was revised to correct a typographical error. R.R. at 8a.

"immediately adjacent to a commercial service alley are unique conditions that limit strict compliance with the Code's requirements." *Id*. at 12a. The Board also found the requested variances "will not cause negative off-site impacts" and were the "minimum necessary to provide relief from the unique conditions associated with the [Property]." *Id*.

Neighbors appealed to the trial court, at which point the City of Pittsburgh intervened in support of the Board's determination and Duncan intervened on its own behalf. *Id*. at 2a-5a, 15a-18a, 247a-48a. The trial court took no new evidence, and after briefing and oral argument, issued its July 13, 2020, decision and order reversing the Board's determination. R.R. at 299a-304a. The trial court found that Duncan had not shown that the Property was truly irregular or that it presented valid "topographical challenges," much less "provide[d] any evidence as to how the shape of the lot contributes to hardship." Trial Court Opinion, 7/13/20; R.R. at 303a. The trial court specifically cited Ms. Joyce's testimony in addition to the other witnesses for Neighbors as to both the negative local impact of Duncan's project and the feasibility of Ms. Joyce's alternative proposal that would not require variances. *Id*. The trial court concluded: "The record does not support the Board's granting of [Duncan's] requested variances. Therefore, the Board's decision approving the variances is reversed." *Id*.

## II. Issues on Appeal

Duncan appealed to this Court, asserting that the trial court erred as a matter of law and abused its discretion in reversing the Board's determination. Specifically, Duncan argued that the trial court incorrectly reweighed the evidence before the Board, failed to give deference to the Board's credibility determinations and interpretation of the Code, and wrongly credited Neighbors' testimony "that

8

concerned redevelopment feasibility but was not based on any financial analysis."[6] *Id*.

In its brief, Duncan maintains that the Board correctly considered all of the evidence, including the irregular shape and size of the Property, the diagonal border along Eden Way, all of the costs associated with acquisition, demolition, and redevelopment, the scarcity of parking in the neighborhood leading to the need for each proposed townhouse to have a garage, and the proximity to the Lawrenceville commercial area. Duncan's Br. at 15-16. Duncan asserts that it established before the Board that without the requested variances, meaningful development and use of the Property would be financially prohibitive and thus commercially impracticable, and that the variances it seeks for the proposed five townhouses are the minimum required to respect the existing local conditions while being financially feasible. *Id*. at 15-17.

Duncan points out that while the Board's decision specifically credited Stookey's testimony in support of the variances to be credible, it did not expressly credit Neighbors' witnesses' testimony, including Ms. Joyce's proposed alternative plan siting only three townhouses on the Property. Duncan's Br. at 17. Thus, Duncan argues that the trial court overstepped its role and wrongly reweighed the

---

[6] Verbatim, Duncan's issues were posed as follows:

    I.  Did the [trial] court abuse its discretion in reweighing the evidence before the [Board]?

    II.  Did the [trial] court err as a matter of law and abuse its discretion when it failed to provide deference to the [Board's] determinations of credibility?

    III.  Did the [trial] court err as a matter of law when it credited testimony in opposition to dimensional variances that concerned redevelopment feasibility that was not based on any financial analysis?

Duncan's Br. at 1 (Statement of Questions Presented).

evidence to favor Ms. Joyce's testimony that the Property could physically be developed without the requested variances over Duncan's countervailing evidence that to do so would be financially unfeasible. *Id*. at 2, 7, 12, & 17 (citing R.R. at 150a-51a, 159a-60a).

Duncan argues that it is not required to show that the property would be utterly valueless or useless without the variances and that the commercial impracticality of proceeding without the variances is sufficient to establish the requisite level of economic hardship. Duncan's Br. at 10-17; Duncan's Reply Br. at 3 (citing *Hertzberg v. Zoning Bd. of Adjustment of Pittsburgh*, 721 A.2d 43, 47 (Pa. 1998) and *Tidd v. Lower Saucon Twp. Zoning Hearing Bd.*, 118 A.3d 1, 8 (Pa. Cmwlth. 2015)).

In response, Neighbors argue that the trial court did not reweigh the evidence presented, but properly limited its inquiry to whether Duncan had submitted sufficient evidence to support the variances it sought and correctly concluded that Duncan had not done so. Neighbors' Br. at 5-6. Neighbors maintain that the trial court did not err in concluding that Duncan failed to meet all of the elements required by the Code and case law. In particular, Neighbors argue that Duncan failed to show that the physical characteristics of the Property, particularly its shape and location, caused sufficient economic hardship warranting the variance sought by Duncan. *Id*. at 8. Neighbors aver that Stookey did not even try to establish this element in his testimony, which was limited to his statement that the Property is an "angled lot." *Id*. at 9 (citing R.R. at 151a). Neighbors argue that Duncan seeks the requested variances solely so that it can "shoehorn" five townhouses onto a lot where three Code-compliant townhouses could be built without the need of

10

variances, and that Duncan's preference or desired design for the Property is insufficient to warrant variances. Neighbors' Br. at 9-10.

Neighbors assert that the cases on which Duncan relies for its argument that this Property presents a basis for variances to be analyzed under a relaxed standard may all be distinguished because the variance applicants in those cases presented evidence of property conditions beyond economic hardship alone, such as the utility easements and potential environmental loss of a longstanding tree line at issue in *Tidd*. Neighbors' Br. at 12-13. Here, Neighbors characterize Duncan's asserted economic detriment as little more than a quest for enhanced profitability through developing a now-vacant lot into expensive single-family homes in order to take advantage of the recent gentrification of the area, which has enacted zoning regulations specifically to address and control the impacts of such development. *Id*.

Neighbors further aver that the two-page financial document prepared by Stookey, purporting to show that putting only four townhouses on the Property would lead to a negative balance sheet for the development project, was insufficient to support the Board's decision. Neighbors' Br. at 6, 14 (citing R.R. at 139a-40a). Neighbors contend that any lack of profitability asserted by Duncan as hardship, based on the $415,000 price of a purchase that is itself contingent on obtaining the variances, is due to Duncan's own decision to gamble that it would receive the variances, and is not itself a basis for the variances. *Id*. at 14-15 (citing *Appeal of Gro*, 269 A.2d 876, 880-81 (Pa. 1970) (variance applicant who paid high price for property because he assumed the variance would be granted and would justify the purchase price was not entitled to variance as hardship was self-inflicted rather than inherent in the property)).

11

Neighbors therefore contend that even if the Board found Stookey's testimony credible, the record contains insufficient facts and evidence to support the Board's decision to grant the variances at issue. Neighbors' Br. at 17. Instead, Neighbors argue that Duncan asked the Board to take its figures on faith and that despite finding Stookey credible, the Board erred in doing so. *Id.* As such, Neighbors maintain that the trial court correctly reversed the Board. *Id.*

### III. Analysis

Where, as here, the trial court did not take any additional evidence, appellate review of the decision of a zoning hearing board is limited to determining whether the board abused its discretion or committed legal error. *Township of Exeter v. Zoning Hearing Bd. of Exeter Twp.*, 962 A.2d 653, 659 (Pa. 2009). An abuse of discretion occurs when a zoning hearing board's findings are not supported by substantial evidence in the record. *Id.* Substantial evidence is that relevant evidence which a reasonable mind would accept as adequate to support the conclusion reached. *Id.* However, the court may not substitute its interpretation of the evidence for that of the zoning hearing board. *Tidd*, 118 A.3d at 13. It is the zoning hearing board's function to weigh the evidence before it and it is the sole judge of the credibility of witnesses and the weight afforded their testimony. *Id.* The appellate court must view the evidence in a light most favorable to the prevailing party, which must be given the benefit of all reasonable inferences arising from the evidence. *Id.*

"A variance is an extraordinary exception and should be granted sparingly[.]" *Heisterkamp v. Zoning Hearing Bd. of Lancaster*, 383 A.2d 1311, 1314 (Pa. Cmwlth. 1978). Section 922.09.E of the Code, which is adopted from Section 10910.2(a) of the Pennsylvania Municipalities Planning Code[7] (MPC), 53 P.S. §

---

[7] Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. §§ 10101–11202.

10910.2(a),[8] provides that the Board may grant a requested variance where it finds that an applicant has established the following conditions:

(1) That there are unique physical circumstances or conditions, including irregularity, narrowness, or shallowness of lot size or shape, or exceptional topographical or other physical conditions peculiar to the particular property and that the unnecessary hardship is due to such conditions and not the circumstances or conditions generally created by the provisions of the zoning ordinance in the neighborhood or district in which the property is located.

(2) That because of such physical circumstances or conditions, there is no possibility that the property can be developed in strict conformity with the provisions of the zoning ordinance and that the authorization of a variance is therefore necessary to enable the reasonable use of the property.

(3) That such unnecessary hardship has not been created by the [applicant].

(4) That the variance, if authorized, will not alter the essential character of the neighborhood or district in which the property is located, nor substantially or permanently impair the appropriate use or development of adjacent property, nor be detrimental to the public welfare.

(5) That the variance, if authorized, will represent the minimum variance that will afford relief and will represent the least modification possible of the regulation in issue.

Code § 922.09.E. Our courts have synthesized the necessary factors into a three-part test in which the variance applicant must show: 1) unique circumstances or conditions of a property that would result in an unnecessary hardship; 2) no adverse

_____
[8] Added by the Act of December 21, 1988, P.L. 1329.

13

effect on the public welfare; and 3) the requested variance would afford relief with the least modification possible. *Dunn v. Middletown Twp. Zoning Hearing Bd.*, 143 A.3d 494, 500 (Pa. Cmwlth. 2016) (citing *Tri-County Landfill, Inc. v. Pine Twp. Zoning Hearing Bd.*, 83 A.3d 488, 520 (Pa. Cmwlth. 2014)).

Where, as here, we are faced with a dimensional variance as opposed to a use variance, our Supreme Court has articulated a more relaxed standard for granting a variance requiring a lesser quantum of proof. "When seeking a dimensional variance within a permitted use, the owner is asking only for a reasonable adjustment of the zoning regulations in order to utilize the property in a manner consistent with the applicable regulations." *Hertzberg*, 721 A.2d at 47. Thus, "the grant of a dimensional variance is of lesser moment than the grant of a use variance, since the latter involves a proposal to use the property in a manner that is wholly outside the zoning regulation." *Id*.

Under this relaxed standard, when addressing the element of unnecessary hardship, "[c]ourts may consider multiple factors, including the economic detriment to the applicant if the variance was denied, the financial hardship created by any work necessary to bring the building into strict compliance with the zoning requirements and the characteristics of the surrounding neighborhood." *Hertzberg*, 721 A.2d at 50. The requisite economic hardship can be shown by "demonstrating either that physical characteristics of the property are such that the property cannot be used for the permitted purpose or can only be conformed to such purpose at a prohibitive expense, or that the property has either no value or only a distress value for any permitted purpose." *Bernotas v. Zoning Hearing Bd. of City of Bethlehem*, 68 A.3d 1042, 1049 (Pa. Cmwlth. 2013) (affirming grant of dimensional variances).

14

Notably, however, while *Hertzberg* eased the requirements in the context of dimensional variances, it did not negate them, and potential economic detriment is only one consideration. *Tidd*, 118 A.3d at 8. A variance applicant must still present evidence establishing each of the conditions listed in the zoning ordinance. *Id*. Where no hardship is shown, or where the asserted hardship amounts merely to a landowner's desire to increase profitability or maximize development potential, the unnecessary hardship criterion required to obtain a variance is not satisfied, even under the relaxed standard. *Id*. The burden on the applicant remains heavy and an applicant "must demonstrate something more than a mere desire to develop a property as it wishes or that it will be financially burdened if the variance is not granted." *Singer v. Phila. Zoning Bd. of Adjustment*, 29 A.3d 144, 150 (Pa. Cmwlth. 2011).

Instances where our Courts have permitted a "purely economic" concern to warrant variances are limited to where the physical aspects of the properties warranted the exceptional remedy of the requested variances because the variance was "the only way for the subject property to be used for virtually any permissible productive use." *Hertzberg*, 721 A.2d at 49-50 (quoting *Vitti v. Zoning Bd. of Adjustment of the City of Pittsburgh*, 710 A.2d 653 (Pa. Cmwlth. 1988)). For example, in *Tidd*, the local zoning board granted and the trial court affirmed dimensional variances concerning the required distance of horse corrals or pastures from lot borderlines. 118 A.3d at 2. Those tribunals found that the existence of a mature tree line, removal of which would entail not only financial but also environmental detriment, and the presence of an extensive utility easement were features of the property sufficient to create the requisite hardship. *Id*. at 10-12.

By contrast, in *Dunn*, the applicant sought to demolish an existing detached single residence on a property and replace it with three lots each having a detached single residence. 143 A.3d at 495. Over objections by neighbors, the local zoning board granted the applicant's requested variances from local zoning code provisions on minimum lot width and density of dwelling units and, after taking no new evidence, the trial court affirmed. *Id.* at 496-97. This Court reversed, concluding that the applicant only needed the variances to subdivide the property and build additional homes on it and therefore the applicant "is creating the alleged hardship it seeks to remedy" in an "effort to maximize profitability." *Id.* at 505. Moreover, because no variance would be needed to make reasonable use of the property with one detached single residence on it (like that which already existed on the property), the requested variances did not constitute the minimum remedies that would afford relief. *Id.*

Instead, this Court noted that based on the evidence presented, the variance applicant's requested variance relief and plan for the property was "an effort to maximize profitability" and that "[t]his is not sufficient to constitute unnecessary hardship." *Dunn*, 143 A.3d at 505 (citing *Tri-County Landfill*, 83 A.3d at 520, and *Cardamone v. Whitpain Twp. Zoning Hearing Bd.*, 771 A.2d 103 (Pa. Cmwlth. 2001)). Moreover, the Court observed in *Dunn* that "where no hardship is shown, or where the asserted hardship amounts to a landowner's mere desire to increase profitability, the unnecessary hardship criterion required to obtain a variance is not satisfied even under the relaxed standard set forth by the Supreme Court in *Hertzberg*." *Id.* at 506 (collecting cases).

In *Pequea Township v. Zoning Hearing Board of Pequea Township*, 180 A.3d 500, 509 (Pa. Cmwlth. 2018), the variance applicant had been advised by

16

a township zoning officer that a permit would not be needed and had proceeded to incur expenses associated with the project before being cited with a violation, after which the applicant sought a variance. *Id.* at 502-03. The local zoning board granted the requested variance and the trial court affirmed. *Id.* at 503-04. This Court reversed, finding on the facts that the applicant's reliance on the advice of a zoning officer that a permit would not be needed failed to establish sufficient financial hardship based on costs already incurred in starting the project without a permit or variance. *Id.* at 509. In doing so, this Court stated that the evidence failed to show that the alleged causes of hardship were inherent in the property rather than its owner. *Id.* at 509.

Moreover, analyzing cases, including *Hertzberg*, this Court noted in *Pequea* that sufficient financial hardship to warrant a variance may be found where projected or incurred costs to bring a property *into conformance* with the code at issue would be unduly or prohibitively high. *Id.* at 508-09. However, where those specific circumstances are not at issue and costs are projected or incurred to construct or modify a property in a nonconforming manner, judicial lenience will not be forthcoming and a local zoning board's grant of a variance may be reversed. *Id.*

As *Dunn* illustrates, where a property can be reasonably used without variances and variances are sought solely to enhance or maximize profitability, even the relaxed standards of *Hertzberg* will not be met. *Dunn*, 143 A.3d at 506 (collecting cases). Where variances are sought solely to enhance profitability, the asserted hardship arises not from the nature and circumstances of the property itself but is self-inflicted by way of the variance applicant's preferred or proposed use of the property. As this Court has stated, a variance "is appropriate only where the *property*, not the person, is subject to hardship." *Pequea Township*, 180 A.3d at 509

17

(quoting *Yeager v. Zoning Hearing Bd. of Allentown*, 779 A.2d 595, 598 (Pa. Cmwlth. 2001)) (emphasis in original). And given the standard, failure to satisfy the criteria of *Hertzberg* constitutes a basis for reversal. *See, e.g.*, *Soc'y Hill Civic Ass'n v. Phila. Zoning Bd. of Adjustment*, 42 A.3d 1178, 1189 (Pa. Cmwlth. 2012).

Here, the essence of Duncan's argument is that the nature of the Property, particularly its shape and orientation in the streetscape, is such that the project must be implemented as proposed, including the requested dimensional variances. Duncan contends that five townhouses are necessary to outweigh the purchase price and the costs associated with demolishing the existing detached single residence and constructing the new townhouses. R.R. at 161a-62a; Appellant's Br. at 12. To fit five townhouses on the Property, the requested dimensional variances are therefore necessary. Appellant's Br. at 12. Duncan avers that the trial court, in focusing on Neighbors' contention that the Property can be physically redeveloped without variances, erroneously ignored the Board's credibility and factual determinations as to the financial feasibility of the project and substituted its own judgment. *Id.* at 13-18.

However, even assuming that Stookey's testimony is credible and his financial analysis is completely accurate, and viewing the evidence in a light favorable to Duncan, who prevailed before the Board, the record as it stands is insufficient to support the Board's conclusion that Duncan satisfied the standards to support the requested variances. Duncan's evidentiary presentation to the Board, combined with Stookey's testimony, does speak in part to the reality of the Property and its orientation within the local streetscape. For example, Stookey explained that the angle of the Property's border on Eden Way led Duncan to orient the proposed townhouses in a staggered manner requiring the requested side setback variances.

18

R.R. at 52a & 151a-54a.  However, Duncan did not present any testimony indicating that due to the Property's irregular shape, "there is no possibility that the property can be developed in strict conformity with the provisions of the zoning ordinance and that the authorization of a variance is therefore necessary to enable the reasonable use of the property."  Code § 922.09.E(2).  Rather, the gist of Duncan's argument in favor of the requested variances is purely economic in nature, as evidenced by Stookey's financial exhibit projecting that constructing just four townhouses as opposed to the proposed five townhouses would lead to a net loss on the overall project, rendering it unfeasible from a profitability standpoint and serving as the basis for Duncan's assertion that without the variances, unreasonable economic hardship will ensue.  *Id*. at 139a & 161a-62a.  The focus of this analysis therefore rests on whether unique circumstances or conditions caused an unnecessary economic hardship to Duncan's ability to make productive use of the Property.  *See* Code § 922.09.E(1).

Notably, Duncan's evidence, taken as credible and accurate, amounts to conclusory figures in support of its quest for profitability as measured by the purchase price it has agreed to pay for the property.  The documentation at issue is only two pages, consisting of Stookey's own unsupported calculations for completing the project with only four townhouses.  R.R. at 139a-40a.  Under "hard costs," the "acquisition" or purchase price from the current owners is listed as $103,750 per unit, for a total purchase price of $415,000.  *Id*.  Duncan admits in its brief that the alleged purchase price of $415,000, cited in the record and purportedly taken from its agreement with the current owner, was contingent on the zoning approval at issue here.  Duncan's Br. at 3; *see also* R.R. at 139a-40a.  Thus, by definition, the purported purchase price represents the value of the Property only to

19

Duncan, and only if it can be developed as Duncan proposes. If the variances are ultimately denied, Duncan can cancel the agreement of sale because it has already acknowledged that the sale is conditioned upon zoning approval. R.R. at 146a; *see also* Duncan's Br. at 3.

Viewing Duncan's evidence in a favorable light and acknowledging that the Board found Stookey's testimony credible, the record is insufficient to support Duncan's assertion that without the requested variances, it will sustain unreasonable economic hardship that is due to the Property itself and not self-inflicted. Code §§ 922.09.E(1), (3); *see also Pequea*, 180 A.3d at 509; *Dunn*, 143 A.3d at 503, 505; *Tidd*, 118 A.3d at 13. The record does not establish that there is a hardship of the Property. Rather, Duncan's proposal presents a hardship solely of and created by Duncan. To otherwise allow Duncan's quest for profitability to fulfill the hardship requirement would mean that any variance applicant could agree to a purchase a property at a higher cost than the actual zoning would warrant and then receive a variance for its proposal that is only necessary to overcome the self-created economic hardship. Hardship is not established simply because an applicant has purchased a property for a certain price in anticipation of obtaining a variance. *Bernotas*, 68 A.3d at 1050. Duncan does not dispute that the Property can be developed with fewer than the five townhouses it proposes and without the requested variances. R.R. at 161a-62a (four townhouses are possible but "feasibly it does not make financial sense to do just four on this parcel"). He does not present any evidence that the nature of the Property precludes development in accordance with the Code, only that he needs more than the Code will allow to make his specific project profitable given the price that he has agreed to pay for the Property. *Id*. Accordingly, the legal standards for dimensional variances are not met and the grant

of variances by the Board must be reversed as a matter of law. Code § 922.09.E; *see also Hertzberg*, 721 A.2d at 46-47; *Dunn*, 143 A.3d at 500.

### IV. Conclusion

In light of the foregoing, the trial court is therefore affirmed.


_____
CHRISTINE FIZZANO CANNON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Lawrenceville Stakeholders,      :
Mary Coleman, Jill Joyce,       :
Bill Joyce and Victor Capone    :
                                    :
         v.              :
                                    :
The City of Pittsburgh Zoning   :
Board of Adjustment           :
                                    :
         v.              :
                                    :
City of Pittsburgh           :
                                    :  No. 779 C.D. 2020
Appeal of: Duncan Ventures, LLC  :

# O R D E R

AND NOW, this 5th day of March, 2021, the Order of the Court of Common Pleas of Allegheny County is AFFIRMED.

_____
CHRISTINE FIZZANO CANNON, Judge